DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Darla Miller, individually and as Administratrix of the estate of William Kachelries, appeals the judgment of the Summit County Court of Common Pleas, which granted summary judgment in favor of appellee, Rubbermaid, Inc., and dismissed appellant's complaint. This Court affirms.
 I. {¶ 2} On October 20, 2005, appellant refiled a complaint against appellee, alleging an employer intentional tort arising out of circumstances wherein William Kachelries was tragically crushed to death in a machine while working for *Page 2 
appellee.[1] Appellant is Mr. Kachelries' mother and the Administratrix of his estate.
 {¶ 3} Appellee filed a motion for summary judgment, and appellant responded in opposition. Appellee replied. On October 13, 2006, the trial court granted appellee's motion for summary judgment. Appellant timely appeals, setting forth one assignment of error for review.
 II. ASSIGNMENT OF ERROR "THE TRIAL COURT IMPROPERLY GRANTED APPELLEE RUBBERMAID'S MOTION FOR SUMMARY JUDGMENT BECAUSE A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO EACH OF THE THREE PRONGS OF THE FYFFE TEST."
 {¶ 4} Appellant argues that the trial court erred by granting summary judgment in favor of appellee, because a genuine issue of material fact exists as to each of the three prongs of the test set forth in Fyffe v.Jeno Inc. (1991), 59 Ohio St.3d 115. This Court disagrees. *Page 3 
 {¶ 5} This Court reviews an award of summary judgment de novo.Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. This Court applies the same standard as the trial court, viewing the facts in the case in the light most favorable to the non-moving party and resolving any doubt in favor of the non-moving party. Viock v. Stowe-WoodwardCo. (1983), 13 Ohio App.3d 7, 12.
 {¶ 6} Pursuant to Civ.R. 56(C), summary judgment is proper if:
 "(1) No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party." Temple v. Wean United, Inc. (1977), 50 Ohio St.2d 317, 327.
 {¶ 7} To prevail on a motion for summary judgment, the party moving for summary judgment must be able to point to evidentiary materials that show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Dresher v.Burt (1996), 75 Ohio St.3d 280, 293. Once a moving party satisfies its burden of supporting its motion for summary judgment with sufficient and acceptable evidence pursuant to Civ.R. 56(C), Civ.R. 56(E) provides that the non-moving party may not rest upon the mere allegations or denials of the moving party's pleadings. Rather, the non-moving party has a reciprocal burden of responding by setting forth specific facts, demonstrating that a "genuine triable issue" exists to be litigated for trial. State ex rel. Zimmerman v. Tompkins (1996), 75 Ohio St.3d 447,449. *Page 4 
 {¶ 8} Appellant alleged that appellee is liable for an employer intentional tort arising out of the circumstances surrounding William Kachelries' unfortunate death while working for appellee on August 18, 2002. Both parties agreed that this matter should be analyzed pursuant to the three-prong test set forth in Fyffe v. Jeno's, Inc. (1991),59 Ohio St.3d 115. The trial court reached its conclusions based upon that test.
 {¶ 9} The Ohio legislature enacted legislation in R.C. 2745.01, effective October 20, 1993, intending to revise the elements and standards of an employer intentional tort. That version of the statute was repealed and a different version of R.C. 2745.01 was passed, effective November 1, 1995. In 1999, the Ohio Supreme Court issuedJohnson v. BP Chemicals, Inc. (1999), 85 Ohio St.3d 298, in which it held R.C. 2745.01 to be unconstitutional in its entirety. Id. at syllabus. Since that time, the 1995 version of the statute has been repealed; and the Ohio legislature passed H.B. 498, revising R.C.2745.01, effective April 4, 2005.
 {¶ 10} The Eighth District Court of Appeals recently issued a decision wherein it declined to apply the current version of R.C. 2745.01, because both the injury occurred and the complaint was filed in 2004 at a time when "there is no controlling statute, [so that] Fyffe and its progeny control our determination." Talik v. Fed. Marine Terminals,Inc. (Aug. 3, 2006), 8th Dist. No. 87073. In this case, Mr. Kachelries' death occurred on August 18, 2002, and the initial complaint was filed in February 2004, when there was no controlling statute. Appellant *Page 5 
refiled her complaint on October 20, 2005, after the effective date of the statute. Neither party, however, has briefed or argued the applicability of the current version of R.C. 2745.01. Accordingly, this Court analyzes the matter within the context of the Fyffe standards; however, we note that our decision would remain the same under the standards set forth in R.C. 2745.01.[2]
 {¶ 11} In Fyffe, the Ohio Supreme Court enunciated the legal standard by which courts must determine whether an employer has committed an intentional tort against an employee:
 "[I]n order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id. at paragraph one of the syllabus. *Page 6 
Furthermore, mere knowledge and appreciation of a risk by an employer is not enough to establish intent. (Quotations omitted.) Barger v. FreemanMfg. Supply Co., 9th Dist. No. 03CA008313, 2004-Ohio-2248, at ¶ 10, citing Fyffe, 59 Ohio St.3d at paragraph two of the syllabus.
 {¶ 12} Moreover, in order to establish an intentional tort by an employer, a plaintiff must demonstrate proof beyond that required to prove negligence or recklessness. Fyffe, 59 Ohio St.3d at paragraph two of the syllabus. If a plaintiff can show that harm or consequences will follow the risk, that the employer knows that injuries to employees are certain or substantially certain to result from the risk, yet the employer still requires the employee to proceed, the employer is treated by the law as if he had in fact desired the end result. See id. This Court has held that it is the element of substantial certainty which differentiates negligence from an intentional tort. Marks v. GoodwillIndustries of Akron, Ohio, Inc., 9th Dist. No. 20706, 2002-Ohio-1379 (Carr, J., dissenting, in part, upon a finding that a genuine issue of material fact exists as to the element of substantial certainty on the facts of the case), citing Van Fossen v. Babcock Wilcox Co. (1988),36 Ohio St.3d 100, 116. "The line must be drawn where the known danger ceases to be a foreseeable risk which a reasonable person would avoid, and becomes in the mind of the [employer] a substantial certainty." (Quotations omitted.) Marks. *Page 7 
 {¶ 13} When determining intent, "this Court proceeds on a case-by-case basis and considers the totality of the circumstances." Id. Concerning substantial certainty, we have stated that:
 "Some of the relevant facts and circumstances which support the conclusion that an employer's knowledge that harm to the employee was a substantial certainty include, but are not limited to: prior acts of a similar nature, the employer's concealment or misrepresentations concerning the danger, and federal and/or state safety violations or noncompliance by the employer with industry safety standards." Id.
Furthermore, in order to prove substantial certainty of harm, this Court has recently held that "a plaintiff must show [that] the level of risk-exposure was egregious." (Quotations omitted.) Pintur v. RepublicTechnologies, Internatl, LLC, 9th Dist. No. 05CA008656, 2005-Ohio-6220, at ¶ 12.
 {¶ 14} Appellant argues that genuine issues of material fact exist in regard to all three prongs of the Fyffe test. The Fyffe test, however, is a conjunctive test, i.e., all three elements must be established in order to maintain a prima facie case of an intentional tort by an employer. It follows, therefore, that if there remains no genuine issue of material fact as to one of the elements, discussion of the other elements becomes moot. See Pintur at ¶ 11 (finding the issue of substantial certainty dispositive and not addressing the otherFyffe elements). Accordingly, because this Court finds it to be dispositive in the instant matter, we begin our discussion with the substantial certainty prong. *Page 8 
 {¶ 15} Appellee supported its motion for summary judgment with the depositions of five people who worked in the plant at the time of Mr. Kachelries' death, as well as the affidavits of three current Rubbermaid employees. Appellant filed the same depositions, as well as some additional documents, in support of her opposition. Based upon a thorough review of the record, this Court cannot say that the risk-exposure presented was egregious. Accordingly, no genuine issue of material fact exists to be litigated, and the trial court's award of summary judgment in favor of appellee was proper.
 {¶ 16} William Kachelries, at the time of his death, was employed by appellee as a process technician, which involved starting up various plastic injection mold machines and making plastic products. Mr. Kachelries worked the 6 p.m. to 6 a.m. shift and was responsible for approximately 18 machines.
 {¶ 17} One such machine was the Husky 605, which is a dual material machine which requires two stages to complete the manufacture of specific storage containers and lids. The Husky 605 has 2 mold halves which compress under pressure. Liquid plastic is injected into the molds to create the product. After cooling, the molds separate, and a robot enters the molds to move the unfinished products from one side of the mold to the other for further processing and to remove finished products after the second injection stage. Part of Mr. Kachelries' job was to "teach" or "touch up" the robot to program it to access the unfinished and finished products in the various molds. *Page 9 
 {¶ 18} The Husky 605 has 3 production modes, to wit: manual, semiautomatic and automatic. In manual mode, the process technician controls every movement of the machine individually by pressing specific buttons. In the semiautomatic mode, one complete production cycle is completed, and the technician must then affirmatively activate the next cycle. In the automatic mode, the machine produces products continuously without cessation between cycles.
 {¶ 19} The Husky 605 has an operator side and a non-operator side. The machine is enclosed in fencing. On the operator side, there are plexiglass doors and a fence which sits less than 18 inches from the floor. The robot's home is on the non-operator side, and that area is enclosed by a fence which rests on the floor. The Husky 605 unit includes safety mechanisms, including programming which prevents the operation of the presses when any gate or door is open. On the day of Mr. Kachelries' death, the Husky 605 was experiencing a problem wherein the machine was not recognizing that the doors had been closed so that it could continue production. The testimony evidenced that the technician would have to "bring the machine all the way down" or reboot it, and the "false open" message would disappear and the machine would run. While the evidence established that the machine would not run without rebooting while it was safe to do so, i.e., when the fences and doors were closed, there was no evidence that a problem existed whereby the machine would run in error when the fences and doors were open. *Page 10 
 {¶ 20} David Costa, Sr. testified during deposition and averred in his affidavit that he was Mr. Kachelries' daytime counterpart. He informed Mr. Kachelries that there was a problem with the Husky 605 in that the computer system was erroneously recognizing that the machine doors were open and the drop bar was not engaged so that the machine would not run after the machine doors were closed without rebooting. Mr. Costa also demonstrated for Mr. Kachelries how he would pry off stuck materials from the mold by reaching under the gate with a brass, a 12-14 inch long piece of brass, so he did not have to open the door, then reboot before continuing. Mr. Costa testified, however, that he did not place his body between the molds. He further testified that he was not instructing Mr. Kachelries to enter into the molds.
 {¶ 21} The employees who investigated the incident concluded that Mr. Kachelries was crushed while he was teaching the robot, because his body was found with the robot teaching pendant in his hand. The employees testified and averred that Mr. Kachelries had crawled under the fence and in between the molds to teach the robot while the machine was running in automatic mode. Mr. Ziler testified that the machine must be in automatic mode in order to move the robot.
 {¶ 22} Brian Ziler averred in his affidavit that he trained Mr. Kachelries as a process technician, while Kyle Cagle trained him as a technician assistant. Mr. Ziler described the appropriate way to "teach" a robot, averring that he taught his process technicians to open the front gate, put the machine in manual mode, turn *Page 11 
off the pumps, and open the back gate. The technician then uses a teaching pendant to program the robot to work within the specific mold. Mr. Ziler averred that, once the robot is positioned, the technician can then leave the cage, shut the gates and turn the pumps back on. He averred that he has never instructed anyone to stand inside the molds while the machine is in automatic mode to teach the robot. He asserted that his investigation of the accident supports the conclusion that Mr. Kachelries was killed while teaching the robot while standing inside the molds while the machine was in automatic mode. Mr. Ziler averred that Mr. Kachelries would have had to have bypassed, or "cheated," every safety device on the machine before his death could occur in that way. Mr. Ziler averred that he did not know what Mr. Kachelries could have been thinking to put himself in that position. He averred that Mr. Kachelries should have waited for the maintenance technician, who was aware of the false open problem to fix the machine before he continued with production.
 {¶ 23} Various employees testified as to Mr. Kachelries' training, both hands-on and by Husky representatives, and that no one was ever trained to bypass the safety mechanisms on the Husky 605. In addition, the evidence demonstrated that there were various warning signs posted on the machine, advising of the danger of serious crushing injuries if one were to bypass the gates and guards while the machine was operating. Accordingly, there is no evidence that appellee was trying to hide the nature of the machine or the risk of a crushing injury, where *Page 12 
a worker failed to respect the barrier guards and other safety mechanisms of the machine.
 {¶ 24} Various employees testified that there has never been a similar incident at Rubbermaid prior to Mr. Kachelries' death, although Mr. Cagle testified that a worker was injured while retrieving a part from underneath a press while working for ASW. Rubbermaid subsequently acquired ASW in 2000. There is no evidence of any similar injuries at the plant after Rubbermaid acquired it.
 {¶ 25} The evidence further demonstrates that appellee was cited by OSHA for several violations after Mr. Kachelries' death. None of those violations, however, were in reference to the Husky 605 machine in which Mr. Kachelries was crushed. Furthermore, there is no evidence that Rubbermaid was cited for any violations relevant to the circumstances surrounding Mr. Kachelries' death prior to the incident.
 {¶ 26} Joseph Saldano testified at his deposition that he was a technical manager at the time of the incident. He testified that the fences, doors, guards and gates on the machines were designed to prevent inadvertent injuries to workers. He asserted that Mr. Kachelries' bypass of those safety mechanisms was a violation of the plant's lockout/tagout policy and that Mr. Kachelries would have been reprimanded for such a violation. Appellant's argument that the lockout/tagout procedure was inapplicable to this situation is not well taken, *Page 13 
because the policy expressly provides that it is applicable when an employee bypasses a guard or safety device.
 {¶ 27} Appellee presented evidence to support a finding that it had no knowledge that Mr. Kachelries was subjected by his employment to a dangerous process, procedure, instrumentality or condition in regard to the Husky 605 so that harm to him would be a substantial certainty. The evidence demonstrates that there were no similar injuries to any of appellee's employees, that appellee had not concealed the danger of crushing injuries if safety devices were bypassed, and that appellee had not received any safety violations in regard to the Husky 605. Furthermore, appellee presented evidence that Mr. Kachelries received both on-the-job training and training by Husky representatives. In addition, appellee presented evidence that no one had instructed Mr. Kachelries to enter the machine in between the molds to teach the robot while the machine was in automatic mode. Appellee's evidence establishes that Mr. Kachelries violated the company's lockout/tagout policy by bypassing the machine's safety devices. "When an employee so exceeds the boundaries of what is acceptable use of a machine or process, we cannot impute knowledge of this risk to an employer." Trojan v. Ro-MaiIndustries, Inc. (Aug. 19, 1998), 9th Dist. No. 18778. Under these circumstances, this Court finds that appellee met its initial burden of showing that it did not have knowledge that Mr. Kachelries would be subjected by his employment to any dangerous process, procedure, instrumentality or condition so *Page 14 
that harm to the employee would be a substantial certainty.Dresher, 75 Ohio St.3d at 293.
 {¶ 28} This Court finds, however, that appellant has failed to meet her reciprocal burden of responding by setting forth specific facts, demonstrating that a "genuine triable issue" exists to be litigated for trial. Tompkins, 75 Ohio St.3d at 449. Appellant presents no affidavits, and no depositions other than those also filed by appellee in support of its motion. Appellant failed to present evidence of prior similar incidents after the plant was acquired from ASW by appellee. Appellant failed to present evidence of any safety violations regarding the Husky 605. In addition, although appellant argued that appellee should have shut down the malfunctioning machine, she failed to present any evidence that the malfunction caused the machine to be more dangerous or that injury was substantially certain to occur as a result of the malfunction.
 {¶ 29} Further, appellant failed to present evidence showing that Mr. Kachelries was inadequately trained, that there were inadequate warnings of a crushing injury if safety devices were bypassed, or that anyone directed Mr. Kachelries to train the machine robot by entering between the molds while the machine was in automatic mode. In fact, the deposition and affidavit testimony of co-workers evidences that Mr. Kachelries' actions in entering between the molds greatly exceeded the boundaries of what was an acceptable use of the machine or the robot-teaching process. Despite the unfortunate and tragic death of Mr. *Page 15 
Kachelries, the evidence indicates that knowledge of the substantial certainty of harm to Mr. Kachelries cannot be imputed to appellee. Under these circumstances, this Court finds that the trial court did not err by granting summary judgment in favor of appellee. Appellant's sole assignment of error is overruled.
 III. {¶ 30} Appellant's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30. *Page 16 
Costs taxed to appellant.
DONNA J. CARR FOR THE COURT
WHITMORE, P. J.
DICKINSON, J.
CONCUR
[1] Appellant alleged a second cause of action sounding in product liability against Husky Injection Molding Systems Ltd. and Husky Injection Molding Systems, Inc. ("Husky"). The trial court granted summary judgment in favor of Husky, but appellant has not appealed from that judgment, and the Husky entities are not parties to this appeal. In addition, appellant alleged an intentional tort claim against Newell Rubbermaid, but the trial court granted summary judgment in favor of Newell on the basis of the running of the statute of limitations. Newell had not been named as a defendant in the initial complaint. Appellant does not appeal from that judgment and Newell Rubbermaid is not a party to this appeal.
[2] The current version of R.C. 2745.01 states, in relevant part: "(A) In an action brought against an employer by an employee, or by the dependent survivors of a deceased employee, for damages resulting from an intentional tort committed by the employer during the course of employment, the employer shall not be liable unless the plaintiff proves that the employer committed the tortious act with the intent to injure another or with the belief that the injury was substantially certain to occur.
"(B) As used in this section, `substantially certain' means that an employer acts with deliberate intent to cause an employee to suffer an injury, a disease, a condition, or death." *Page 1